### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:23-cr-87-1 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| ANTHONY JACOB SMEDLEY, SR., | : | |
| | : | |
| Defendant. | : | |

---

### ENTRY AND ORDER DENYING MOTION TO SUPPRESS AND REQUEST FOR HEARING (DOC. NO. 28)

---

Currently before the Court is a Motion to Suppress and Request for Hearing (the "Motion") (Doc. No. 28), filed by Defendant Anthony Jacob Smedley, Sr. ("Smedley"). Smedley requests that the Court suppress certain evidence from admission at trial on three broad premises. (Doc. No. 28.) First, Smedley contends that he was subject to an unlawful traffic stop. (Doc. No. 39 at PageID 333-38.) Second, Smedley argues that any of his custodial statements to law enforcement in this case were obtained in violation of his constitutional rights. (*Id.* at PageID 338-39.) Finally, Smedley challenges sufficient probable cause for the issuance of two warrants authorizing the search of his home on two separate occasions. (*Id.* at PageID 330-33.) Under Smedley's theories, all physical evidence and statements obtained as a result of these police actions are the fruits of constitutional violations and must not be used against him at trial. (*See* Doc. No. 28.) For the reasons discussed below, the Court **DENIES** Smedley's Motion.

### I.    BACKGROUND

Briefly, Smedley has been indicted by a grand jury on charges concerning the alleged trafficking of methamphetamine. (*See* Doc. No. 15 at PageID 74-75.) Naturally, Smedley's case

was preceded by a police investigation. (*See* Doc. No. 1 at PageID 2-8.) The Court is best served by examining how the events of that investigation and subsequent prosecution have unfolded sequentially.

### A. Beginning of the Investigation

At a hearing on the instant Motion, Dayton Police Department Task Force Officer, Detective Dustin J. Phillips ("Detective Phillips"), testified that in the latter months of 2022, he fielded an anonymous voicemail left on the regional Miami Valley Crime Stoppers Tip Line (the "Crime Stoppers Tip"). (Doc. No. 38 at PageID 278.) The Crime Stoppers Tip advised that an individual named "Tony Smedley" was dealing in various narcotics at 3021 North Dixie Drive, in Dayton, Ohio. (*Id.*; *see also* Gov't. Ex. 1 at pp. 1-2.) The Crime Stoppers Tip further specified that a Cincinnati Bengals flag flew on the front porch of the alleged drug trafficking premises. (Doc. No. 38 at PageID 278.) There is no available evidence to suggest that the anonymous informant was reliable and trustworthy *per se*, nor does any evidence indicate the basis of the informant's knowledge.

Nevertheless, in light of the specific details provided, Detective Phillips began to follow up on the Crime Stopper's Tip. (*Id.*) First, Detective Phillips conducted a police database search for the name "Tony Smedley." (*Id.*) The results of this search revealed Smedley's full name, provided Smedley's previous felony convictions, indicated that Smedley's driver's license had been suspended, and listed Smedley's address as 3023 North Dixie Drive, Apartment 1. (Doc. No. 38 at PageID 278, 286; Gov't. Ex. 1 at pp. 2.) Detective Phillips then searched Smedley's address on the local county auditor's website and found that Smedley's apartment building is a multi-unit dwelling, using the address 3021 North Dixie Drive. (Gov't. Ex. 1 at pp. 2.) When Detective Phillips visited the apartment building, he saw a Cincinnati Bengals flag flying on the porch

2

belonging to the front-right unit of the dwelling and a mailbox for the front-right unit, which bore the number "3023." (*Id.*)

Having corroborated the Crime Stoppers Tip, in mid-December of 2022, Detective Phillips and his team started surveilling Smedley's residence. (Doc. No. 38 at PageID 279.) Over a period of approximately two months, law enforcement witnessed activity at Smedley's residence that Detective Phillips, based on his seventeen years of police training and experience, determined to be consistent with drug trafficking. (*Id.* at PageID 276-77, 279.) The officers observed individuals arrive at Smedley's residence, enter the residence for a short period of time, and then leave Smedley's residence. (*Id.* at PageID 279.) In two instances, Detective Phillips stopped individuals leaving Smedley's apartment. (*Id.*) Each stopped individual was found in possession of narcotics that the individuals said they had just purchased at Smedley's home. (*Id.*) On one occasion, Detective Phillips saw Smedley briefly exit his residence to place a small object appearing to be a plastic baggie in his mailbox before immediately going back inside. (Gov't. Ex. 1 at pp. 3.) Shortly thereafter, Detective Phillips watched an individual retrieve the object from Smedley's mailbox and replace it with cash. (*Id.*) Lastly, while conducting surveillance, members of Detective Phillips' team once observed Smedley exit his home carrying an item tightly wrapped in a Cincinnati Bengals blanket, resembling the shape of a rifle or shotgun. (*Id.*; *see also* Doc. No. 38 at PageID 281.)

### B. **Events of February 9, 2023**

On February 8, 2023, Detective Phillips submitted a sworn affidavit in the Montgomery County Court of Common Pleas applying for a warrant to search Smedley's apartment. (*See* Gov't. Ex. 1.) The same day, Montgomery County Common Pleas Judge Mary Katherine Huffman issued a search warrant for Smedley's residence (the "State Warrant"). (*See* Gov't. Ex. 2.) There, Judge

3

Huffman found probable cause—based on the allegations contained in Detective Phillips' affidavit—to believe evidence of drug trafficking would be found in Smedley's home. (*Id.* at pp. 1.)

Detective Phillips and his team returned to Smedley's apartment building to execute the State Warrant on February 9, 2023. (Doc. No. 38 at PageID 284.) Because they suspected that Smedley would be armed, the team prepared a risk management plan for executing the State Warrant. (*Id.* at PageID 285.) They decided to conduct a "surveillance takedown," whereby the police would wait for Smedley to exit his residence, detain him, and then proceed to execute the search warrant. (*Id.*) Detective Phillips testified that "the plan was fluid" and his team intended to stop Smedley as he left his apartment, whether he left on foot or by car. (*Id.* at PageID 300.) Detective Phillips had marked police cruisers staged nearby to stop Smedley if he left in a car. (*Id.* at PageID 286.) All officers involved were advised of this plan and given information on Smedley. (*Id.* at 287.)

On the day of the search, Smedley exited his apartment and left in a car that police had seen him driving before. (*Id.* at PageID 286.) Dayton Police Department Task Force Officer, Detective Tyler Orndorff ("Detective Orndorff"), began to follow Smedley away from the apartment building in an unmarked police vehicle. (*Id.*) Detective Orndorff knew that Smedley did not have a valid driver's license. (*Id.*) Moreover, Detective Phillips testified that Detective Orndorff witnessed Smedley fail to make a turn signal as he turned onto a street going away from his apartment. (*Id.*) In total, Smedley made two turns and was stopped by a marked police cruiser about a quarter-mile away from his apartment. (*Id.* at PageID 287.)

This traffic stop was conducted by Detective Orndorff and a uniformed officer. (*Id.*) Based on the drug trafficking investigation of Smedley, the officers suspected that Smedley may be armed

when they initiated the stop. (*Id.*) Accordingly, Smedley was removed from his vehicle and patted down. (*Id.*) However, Smedley was not found to be in possession of any weapons. Instead, the pat down revealed Smedley to be in possession of keys to his vehicle and his apartment, a cell phone, and $3,585.00 in cash. (*Id.* at PageID 287-88.) The officers detained Smedley in the back seat of the police cruiser before attempting to make arrangements for Smedley's vehicle. (*Id.* at PageID 288-89.) Eventually, the officers convinced Smedley to call his girlfriend to retrieve the car. (*Id.* at PageID 302.) When Smedley's girlfriend arrived at the traffic stop, she was immediately arrested on outstanding warrants and placed in the back of the police cruiser with Smedley. (*Id.* at PageID 289.)

Once Smedley and his girlfriend were detained, they were returned to their apartment. (*Id.* at PageID 290.) With all perceived potential threats now sitting in the back of a squad car, Detective Phillips and his team executed the State Warrant on Smedley's residence. (*Id.*) Very generally, the search uncovered "a large amount of suspected narcotics; two firearms, one being a pistol and the other being a stolen AR-15 rifle [wrapped in a Cincinnati Bengals blanket]; as well as possessory interests linking Mr. Smedley to the house." (*Id.* at PageID 290-91.) After the search was completed, Detective Phillips approached Smedley for questioning and advised him of his *Miranda* rights. (*Id.* at PageID 291.) Despite those rights, Smedley voluntarily answered Detective Phillips' questions. (*Id.*) Smedley was then placed under arrest on state law drug charges and subsequently released. (Gov't. Ex. 3 at pp.6.)

### C. **Events of September 13, 2023**

In the following months, Detective Phillips continued investigating Smedley for suspected drug trafficking. (Doc. No. 38 at PageID 294.) On March 13, 2023, Detective Phillips fielded another voicemail tip provided through the Miami Valley Crime Stoppers Tip Line. (Gov't. Ex. 3

at pp. 7.) This anonymous tip alleged that, a little more than one month after the search of Smedley's residence, Smedley had resumed dealing drugs from 3023 North Dixie Drive, Apartment 1. (*Id.*)

In August of 2023, Detective Phillips sought the assistance of a confidential informant who had proven to be reliable in other drug trafficking investigations. (Doc. No. 38 at PageID 294; Gov't. Ex. 3 at pp. 7.) On August 31, 2023, Detective Phillips and his informant orchestrated a controlled buy of narcotics from Smedley's apartment. (Gov't. Ex. 3 at pp. 7.) Before conducting the controlled buy, the confidential informant was patted down to ensure that they had no drugs or money on their person. (*Id.*) Detective Phillips then provided the informant with cash and sent the informant into Smedley's residence. (*Id.* at pp. 8.) When the confidential informant returned from Smedley's apartment, they turned over an unspecified amount of suspected narcotics and stated that Smedley had sold them the drugs. (*Id.*; Doc. No. 38 at PageID 294.) Following this controlled buy, law enforcement searched the garbage bin (a "trash pull") belonging to Smedley's apartment. (Doc. No. 38 at PageID 294.) In the garbage, Detective Phillips noticed many plastic baggies, some of which had been tampered with or contained residue, which Detective Phillips considered to be consistent with drug trafficking. (*Id.*; Gov't. Ex. 3 at pp. 8.)

On September 8, 2023, Detective Phillips submitted a sworn affidavit to the U.S. District Court for the Southern District of Ohio seeking a second search warrant for Smedley's home. (Doc. No. 38 at PageID 292; *see also* Gov't. Ex. 3.) The affidavit alleged facts just iterated here. Again, on September 8, 2023, United States Magistrate Judge Caroline H. Gentry issued a federal search warrant for Smedley's apartment (the "Federal Warrant"). (Gov't. Ex. 4.)

The Federal Warrant was executed five days later, on September 13, 2023. (Doc. No. 38 at PageID 293.) This time, Detective Phillips did not coordinate a "surveillance takedown."

6

Rather, the Federal Bureau of Investigation's Special Weapons and Tactics ("SWAT") team executed the Federal Warrant. (*Id.* at PageID 295.) The SWAT team entered Smedley's apartment and emerged with Smedley and his girlfriend in short order. (*Id.*) Smedley was placed under arrest and found with $4,207.00 in his pockets. (*Id.*) Detective Phillips testified that Smedley was not *Mirandized* or interrogated at this time. (*Id.* at PageID 295-96.) Otherwise, the execution of the Federal Warrant resulted in authorities finding a sizable quantity of suspected narcotics and a pistol in Smedley's residence.

### D. Procedural History

This case was brought before the Court pursuant to a criminal complaint, filed on September 14, 2023. (Doc. No. 1.) Smedley was arrested on September 19, 2023, and ordered to remain detained pending trial. (Doc. Nos. 9; 10.) On September 26, 2023, Smedley was indicted by a federal grand jury of four counts: conspiracy to knowingly possess with the intent to distribute 500 grams or more of a substance containing methamphetamine, in violation of 21 U.S.C. § 846; maintaining a premises for purposes of drug trafficking, in violation of 21 U.S.C. 856(a)(1); and two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 15 at PageID 74-75.)

On February 1, 2024, Smedley filed the present Motion. (Doc. No. 28.) The Court held a hearing on the matter on March 13, 2024, and ordered the Parties to file memoranda in support of their respective positions. (Doc. No. 38.) On April 24, 2024, Smedley filed his Post Suppression Hearing Memorandum ("Smedley's Memo") (Doc. No. 39). The Government submitted The United States' Brief in Opposition to Defense Suppression Motion (the "Government's Memo") (Doc. No. 40) on May 7, 2024, and on May 24, 2024, Smedley Filed his Reply to Government's Brief in Opposition to Defense's Suppression Motions ("Smedley's Reply") (Doc. No. 46).

Smedley's Motion is now ripe for review and decision.

## II. ANALYSIS

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Smedley currently presents his suppression arguments in three branches. (*See e.g.*, Doc. No. 39 at PageID 327-28.) In Branch III, Smedley argues that there was insufficient probable cause to justify the two search warrants for his home, in violation of the Fourth Amendment of the Constitution. (*Id.* at PageID 327.) In Branch I, Smedley challenges the constitutionality of the traffic stop initiated against him on February 9, 2023. (*Id.* at PageID 328.) And, in Branch II, Smedley contends that all of his statements made in the course of Detective Phillips' investigation were taken in violation of Smedley's rights under the Fourth, Fifth, and Sixth Amendments of the Constitution. (*Id.*) The Court addresses each basis for Smedley's Motion accordingly.

### A. Branch III – The Search Warrants

#### i. Fourth Amendment Searches Generally

As an initial matter, the Court finds it necessary to set forth basic principles pertaining to searches under the Fourth Amendment. The Fourth Amendment of the Constitution, made applicable to the states by the Fourteenth Amendment, protects:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV. Put more simply, "absent certain exceptions," law enforcement may not conduct a search before obtaining "a warrant from a neutral and disinterested magistrate." *Franks*

*v. Delaware*, 438 U.S. 154, 164 (1978).  This right rests on the assurance that a magistrate will not

issue a search warrant without a showing of probable cause to justify the requested search.  *U.S.*

*v. Abboud*, 438 F.3d 554, 569 (6th Cir. 2006) ("Only if the magistrate finds probable cause can she

issue a search warrant").  In all, the Fourth Amendment protects against unreasonable searches by

"'requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a

neutral and detached magistrate instead of being judged by the officer engaged in the often

competitive enterprise of ferreting out crime.'"  *Illinois v. Gates*, 462 U.S. 213, 240 (1983)

(quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)) (alterations in original).

Because the government's request for a warrant constitutes an *ex parte* proceeding, the

government must bear the burden of establishing probable cause.  *Abboud*, 438 F.3d at 569 (citing

Fed. R. Crim. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)).  To meet its

burden, the government is expected to offer an affidavit containing "facts that indicate a fair

probability that evidence of a crime will be located on the premises of the proposed search.'"  *U.S.*

*v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *United States v. Jenkins*, 396 F.3d 751, 760

(6th Cir. 2005)).  The government need not possess evidence that would secure a conviction

beyond a reasonable doubt.  *Wong Sun v. U.S.*, 371 U.S. 471, 479 (1963).  "[P]robable cause is a

fluid concept" inherently tied to "an assessment of probabilities" and based on variable and

particularized facts.  *Gates*, 462 U.S. at 231.

As such, magistrates reviewing an affidavit for probable cause must draw from the totality-

of-the-circumstances presented.  *Id.*; *see also Wong Sun*, 371 U.S. at 479 (probable cause "must

be measured by the facts of the particular case").  By the totality of the circumstances, a

magistrate's determination of probable cause will generally stand when she had a substantial basis

for concluding that the search would yield evidence of criminality.  *Gates*, 462 U.S. at 236 (quoting

*Jones v. United States*, 362 U.S. 257, 271 (1960)). Whether a magistrate had a substantial basis for her probable cause determination is to be judged based solely on the four corners of the affidavit. *U.S. v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)). Indeed, magistrates' probable cause determinations should most often "be paid great deference." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

   With certain exceptions, any evidence obtained as a result of an unlawful search cannot be used as evidence against the victim of the search. *Wong Sun*, 371 U.S. at 484 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). This exclusionary rule is not enshrined in the Fourth Amendment. *U.S. v. Leon*, 468 U.S. 897, 906 (1984). Instead, the exclusionary rule is "'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect . . . .'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Where exclusion of evidence would not provide a meaningful deterrent to future police misconduct, the exclusionary rule will not apply, notwithstanding a violation of the Fourth Amendment. *U.S. v. Janis*, 428 U.S. 433, 453-54 (1976) (if "the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted"). The Supreme Court has declared that the benefits of excluding inculpatory evidence in the absence of any deterrent effect are far outweighed by the truth-finding interests of our adversarial justice system. *Leon*, 468 U.S. at 907.

### ii.    Application

   The Court now redirects its focus to the matter at hand. Smedley argues that neither the State Warrant nor the Federal Warrant were supported by probable cause. (*See* Doc. No. 39 at PageID 330.)

### a. **The State Warrant**

Regarding the State Warrant, Smedley contends that the State Warrant was unsupported by probable cause on several grounds. (*Id.* at PageID 330-31.) First, Smedley challenges Detective Phillips' reliance on the anonymous Crime Stoppers Tip by casting doubt on the veracity of its source. (*Id.* at PageID 330.) Second, Smedley submits that over two months of surveillance, Detective Phillips and his colleagues did not actually see that many people enter and exit Smedley's residence. (*Id.*) Third, Smedley insinuates that law enforcement's suspicion that he impermissibly possessed a firearm was unfounded. (*Id.* at PageID 331.) Smedley emphasizes that Detective Phillips only testified to seeing him "carrying an item wrapped in a blanket or cloth." (*Id.*) Finally, Smedley argues that law enforcement could not establish probable cause by describing an incident where Smedley placed an unknown object in his mailbox, only to be swapped for cash by an unidentified individual. (*Id.*) For all Detective Phillips knew, says Smedley, this could have simply been a harmless Facebook Marketplace exchange. (*Id.*)

To start, the Court addresses the Crime Stoppers Tip decried by Smedley. Standing alone, an anonymous tip generally cannot provide a substantial basis for a magistrate's probable cause determination. *Gates*, 462 U.S. at 227. Anonymous tips often provide "virtually nothing from which one might conclude that the [tipper] is either honest or reliable." *Id.* Yet, under the totality-of-the-circumstances, a magistrate may rely more readily on an anonymous tip in making her probable cause determination where the anonymous tip has been corroborated by law enforcement. *Id.*

In the present case, the Crime Stoppers Tip did little more than alert law enforcement to Smedley. Detective Phillips did not go before the Montgomery County Court of Common Pleas to obtain a search warrant upon receiving the Crime Stoppers Tip. Rather, he investigated the

11

name and address provided in the Crime Stoppers Tip. (Gov't. Ex. 1 at pp. 2.) When he corroborated Smedley's name and address to his satisfaction, Detective Phillips observed Smedley's apartment building. (*Id.*) By observing Smedley's residence for himself, Detective Phillips witnessed a Cincinnati Bengals flag flying on Smedley's porch, further corroborating the Crime Stoppers Tip. (*Id.*)

Detective Phillips and his colleagues proceeded to conduct surveillance on Smedley's apartment. (*Id.*) Over the course of their investigation, law enforcement observed multiple instances of individuals coming and going from Smedley's residence, only staying for several minutes and never returning. (*Id.*) They even managed to stop at least two of these individuals and found them to be in possession of narcotics. (*Id.*) When questioned, each individual stopped stated that they had just purchased the drugs from Smedley at Smedley's apartment. (*Id.*)

Additionally, Detective Phillips observed the exchange made through Smedley's mailbox. (*Id.* at pp. 3.) Detective Phillips swore that, based on his lengthy experience investigating drug trafficking cases, this type of interaction is consistent with drug trafficking. (*Id.*) Whether this interaction could have been a lawful exchange is somewhat irrelevant here. Because a probable cause determination deals inherently with probabilities, whether this mailbox exchange helps establish probable cause is to be decided largely based on whether the exchange lends itself to probable criminality. Detective Phillips' expertise suggests that it does.

Finally, when Detective Orndorff observed Smedley exit his apartment with an object wrapped in cloth, he did not observe some amorphous shape beneath a blanket. He specifically saw Smedley carrying an item "wrapped in a large piece of fabric" that "was in the shape of a rifle or shotgun." (*Id.*)

Altogether, the Court finds that the facts alleged in the four corners of Detective Phillips' affidavit establish a substantial basis for Judge Huffman's probable cause determination. Detective Phillips' expertise and, to be sure, common sense indicate that the events observed at Smedley's residence are substantially consistent with drug trafficking. What's more, seeing Smedley carry an item that, although concealed, takes the shape of a rifle or shotgun gives rise to the probability that Smedley possessed firearms. Smedley's arguments here conflate reasonable doubt with a lack of probable cause. Dealing with inherent probabilities, Detective Phillips' observations—bolstered by his experience and training—are more than sufficient to establish probable criminality at Smedley's apartment. Accordingly, the Court **DENIES** Smedley's Motion with respect to the State Warrant.

### b.  <u>The Federal Warrant</u>

Regarding the Federal Warrant, Smedley again seeks to cast doubt on the individual elements of Detective Phillips' investigation informing his application for the Federal Warrant. On this front, Smedley first argues that the controlled buy orchestrated by Detective Phillips in August of 2023 is too unreliable to establish probable cause. (Doc. No. 39 at PageID 331-32.) Specifically, Smedley claims that there is no evidence, apart from Detective Phillips' declaration, to suggest that Detective Phillips' confidential informant is trustworthy, reliable, accurate, and truthful. (*Id.*) Next, Smedley asserts that the trash pull following the controlled buy did not sufficiently tie Smedley's apartment to the illicit contents of his garbage bin to establish probable cause. (*Id.* at PageID 332-33.) Third, Smedley takes issue with Detective Phillips' testimony that Smedley lived in a "high crime area." (*Id.* at PageID 333.) He argues that the fact that someone lives in a high crime area, standing alone, does not support a finding of probable cause. (*Id.*)

The Court notes that the fact that Smedley lives in a high crime area was not discussed in Detective Phillips' affidavit applying for the Federal Warrant. Detective Phillips simply included this fact in his testimony on the instant Motion. (Doc. No. 38 at PageID 297.) Because the proclivities of Smedley's neighborhood do not appear within the four corners of Detective Phillips' affidavit, the Court will not consider them here as evidence either supporting or undermining Magistrate Judge Gentry's probable cause determination.

In addition, Smedley makes no mention as to why Detective Phillips resumed investigating his activities after executing the State Warrant. As is reflected above, Detective Phillips received another anonymous tip on the Miami Valley Crime Stoppers Tip Line, alleging that Smedley was still actively engaging in drug trafficking from his apartment. (Gov't. Ex. 3 at pp. 7.)

To address Smedley's most substantive point, "[i]nformation supplied by an informant of proven reliability may be sufficient, standing alone, to demonstrate probable cause." *U.S. v. Helton*, 314 F.3d 812, 821 (6th Cir. 2003) (quoting *U.S. v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999)) (internal quotation marks omitted). An affiant seeking a search warrant "need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *U.S. v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001). Further, an affidavit supporting a search warrant is entitled to a presumption of validity. *Franks*, 438 U.S. at 171. To overcome this presumption, a defendant must, at the very least, offer "allegations of deliberate falsehood or of reckless disregard for the truth, and [those allegations] must be accompanied by an offer of proof." *Id.*

Smedley cannot overcome the presumption of validity afforded to Detective Phillips' affidavit. Detective Phillips explicitly stated that the confidential informant used to conduct a controlled drug buy from Smedley's apartment had previously proven themselves to be accurate, reliable, and trustworthy. (Gov't. Ex. 3 at pp. 7.) Smedley offers no proof to refute Detective

14

Phillips' sworn statement in this regard. To wit, Smedley does not even allege a deliberate falsehood or reckless disregard for the truth. He only attempts to create a reasonable doubt as to the truth of Detective Phillips' sworn statements. (*See* Doc. No. 39 at PageID 331-32.) Smedley may cross-examine Detective Phillips accordingly at trial. Though, at present, this potential source of reasonable doubt will not do to negate the veracity of Detective Phillips' affidavit.

Presuming the veracity of Detective Phillips' affidavit, the Court finds that the controlled buy conducted here does, standing alone, demonstrate a substantial basis for Magistrate Judge Gentry's probable cause determination when issuing the Federal Warrant. The informant was patted down for drugs and money before entering Smedley's apartment and was given cash with which to buy drugs. (Gov't. Ex. 3 at pp. 7.) The informant entered Smedley's residence. (*Id.* at pp. 8.) When they returned to Detective Phillips, the informant had no cash and was in possession of a substance which proved to be methamphetamine. (*Id.*) The most reasonable inference to draw from this scenario is that the confidential informant probably purchased methamphetamine from Smedley's apartment.

At any rate, even if the controlled buy alone did not establish a substantial basis for Magistrate Judge Gentry's probable cause determination, the totality of the circumstances ultimately does. Detective Phillips received an anonymous tip that Smedley was continuing to traffic narcotics from his apartment. (Gov't. Ex. 3 at pp. 7.) This tip led Detective Phillips to orchestrate a controlled buy that, as the Court has just explained, most reasonably lent itself to the inference that drugs were being trafficked from Smedley's apartment. Detective Phillips then conducted a trash pull that revealed plastic baggies, at least one of which containing fentanyl residue, from Smedley's garbage bin. (*Id.*) Although the plastic baggies are not suspicious in and of themselves, they serve to further corroborate the fruits of Detective Phillips' investigation

preceding the trash pull.  That the garbage bin was associated with Smedley's apartment is sufficient to trigger the probability that drugs were being trafficked from Smedley's apartment. With each investigatory step corroborating the one before it, Detective Phillips' affidavit offers ample evidence to form a substantial basis for a finding of probable cause to search Smedley's apartment.

Therefore, the Court **DENIES** Smedley's Motion with respect to the Federal Warrant.

### B.  Branch I – The Traffic Stop

The Court turns next to the traffic stop and detention of Smedley on February 9, 2023, the date that the State Warrant was executed.  Broadly speaking, Smedley challenges the traffic stop as solely pretextual and totally lacking in a legal justification.  (Doc. No. 39 at PageID 335-38.) More specifically, Smedley argues that there is insufficient evidence to suggest he failed to initiate a turn signal, in violation of Ohio Rev. Code. § 4511.39, or that law enforcement actually had probable cause to believe that he was operating a motor vehicle without a valid driver's license, in violation of Ohio Rev. Code. § 4507.02.  (*Id.* at PageID 336-37.)

Smedley posits that law enforcement's only reason to stop him on February 9, 2023, was to effectuate execution of the State Warrant.  (*Id.* at PageID 337.)  A full quarter-mile from his apartment when stopped, Smedley contends that he posed no threat to the execution of the State Warrant and, therefore, his detention incident to the execution of the State Warrant was unlawful. (*Id.*)  Consequently, Smedley requests that the Court suppress all evidence derived from the February 9 traffic stop.  (*Id.* at PageID 338.)

Just as the Fourth Amendment protects individuals from unreasonable searches, it likewise protects individuals from unreasonable seizures.  U.S. Const. Amend. IV.  The detention of an individual by law enforcement, no matter how brief, is regarded as a seizure of the individual's

person, under the Fourth Amendment. *Wren v. U.S.*, 517 U.S. 806, 809-10 (1996). Whether a detention is reasonable within the meaning of the Fourth Amendment is determined from the totality-of-the-circumstances. *United States v. Warfield*, 727 Fed. App'x. 182, 186 (6th Cir. 2018) (quoting *United States v. Ferguson*, 8 F.3d 385, 391-92 (6th Cir. 1993)).

It is generally reasonable for law enforcement officers seeking to execute a search warrant to "detain the occupants of the premises [to be searched] while a proper search is conducted." *Bailey v. U.S.*, 568 U.S. 186, 193 (2013) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)) (internal quotation marks omitted and alteration added). Such detentions are justified by three distinct governmental interests. *Bailey*, 568 U.S. at 194. First, detentions incident to the execution of a search warrant serve to protect officers from the risk of harm. *Id.* (quoting *Summers*, 452 U.S. at 702). Second, such detentions are often likely to facilitate "'the orderly completion of the search . . ..'" *Id.* (quoting *Summers*, 452 U.S. at 703). And third, detaining occupants of a residence to be searched alleviates the risk that those individuals will take flight if the search uncovers evidence of criminality. *Id.* (quoting *Summers*, 452 U.S. at 702). Where a detention incident to search would plainly serve these interests, law enforcement's "authority to detain . . . is categorical." *Muehler v. Mena*, 544 U.S. 92, 98 (2005).

However, the broad authority to detain individuals incident to a search is limited to the "immediate vicinity of the premises to be searched." *Bailey*, 568 U.S. at 199. "Once an individual has left the immediate vicinity of a premises to be searched, . . . detentions must be justified by some other rationale. *Id.* at 202.

By contrast, law enforcement's decision to stop an automobile and detain its occupants is reasonable, *per se*, when the officer has "probable cause to believe that a traffic violation has occurred" in his presence. *Wren*, 517 U.S. at 810. An officer who observes a traffic violation

17

will certainly have probable cause to initiate a traffic stop in response to that violation. *Id.* at 817 (quoting *Delaware v. Prouse*, 440 U.S. 648, 659 (1979)) ("[T]he foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations") (internal quotation marks omitted). Additionally, an officer may initiate a traffic stop based on probable cause without personal knowledge when a basis for probable cause has been communicated to him by his fellow officers. *U.S. v. Hensley*, 469 U.S. 221, 231 (1985). To this end, officers "cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* (internal citations and quotation marks omitted).

So long as this requisite probable cause exists, an officer's pretextual reason for initiating a traffic stop is largely inconsequential. *See Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). To be sure, "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the [officer's] subjective intent." *Id.* at 814 (*emphasis in original*).

Once an officer has lawfully detained a vehicle's occupant pursuant to a traffic stop, the officer may take certain actions to preserve his own safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Responding officers may order the vehicle's occupant out of the car to separate the occupant from surroundings that are unknown and potentially dangerous to the officer. *Id.* ("[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile"). Based on similar rationale, an officer conducting a stop may, upon reasonable suspicion that the individual seized might be armed, pat down his detainee for weapons. *See Terry v. Ohio*, 392 U.S. 1, 29 (1968). Such a pat down must be "confined in scope to an intrusion reasonably designed to discover [weapons]." *Id.* After "the purposes of the initial traffic stop [are] completed," officers cannot prolong the stop unless the events of the traffic stop gave

rise to reasonable suspicion justifying continued detention. *U.S. v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995).

Turning to the present case, the Court finds that Smedley was detained incident to a lawful traffic stop on February 9, 2023. The Court agrees that Smedley could not have been lawfully detained incident to execution of the State Warrant. He was simply not in the immediate vicinity of his apartment building—the premises to be searched. Smedley was a quarter-mile away from his apartment and, after making two turns away from the premises, he almost certainly could not have seen that his home was being subjected to a search. Under those circumstances, Smedley was highly unlikely to threaten officer safety, pose a risk of flight, or interfere with the execution of the State Warrant.

However, all of the officers involved had sufficient probable cause to believe that Smedley had committed a traffic violation at the time he was stopped. Even assuming that Smedley was not seen committing a turn signal violation, the officers had clear authority to stop Smedley for driving without a valid license, in violation of Ohio Rev. Code § 4507.02. Detective Phillips had determined that Smedley did not have a valid driver's license. (Doc. No. 38 at PageID 286.) While Smedley attempts to discredit Detective Phillips' testimony on this point, he offers no actual evidence to refute it. Detective Phillips communicated his knowledge of Smedley and the plan to detain him prior to executing the State Warrant to his fellow officers. (*Id.*) Detective Orndorff and his fellow officers did not need personal knowledge of Smedley's suspended driver's license. It is enough that they received this information from Detective Phillips. Thus, as soon as officers observed Smedley drive away in an automobile, they had sufficient probable cause to believe that Smedley had committed a traffic infraction.

The Court also finds that the actions taken during the course of the February 9 traffic stop were wholly justified.  Based on their collective knowledge, Detective Orndorff and his colleague had reasonable suspicion to believe Smedley might be armed.  To order Smedley from the vehicle and pat him down for weapons was squarely within the officers' authority.  While the officers did not discover weapons, the pat down did reveal Smedley to be in possession of a large sum of cash.  (Doc. No. 38 at PageID 288.)  Again, based on their collective knowledge, the officers at least had reasonable suspicion to continue their detention of Smedley.  All events preceding the traffic stop lent themselves to the reasonable suspicion that Smedley was trafficking illicit drugs.  Further, by their experience and training as law enforcement professionals, finding Smedley in possession of such a large sum of cash would understandably pique the officers' suspicion.

In sum, the February 9, 2023, traffic stop of Smedley was justifiably based on probable cause that Smedley had committed a traffic violation.  All actions taken by officers during the course of the stop worked to preserve officer safety, effectuate the traffic stop, and otherwise indulge the officers' reasonable suspicions.  Hence, the Court **DENIES** Smedley's Motion with respect to the February 9, 2023, traffic stop.

### C.  Branch II – Smedley's Statements

At last, the Court must determine whether statements made by Smedley to law enforcement were obtained in violation of Smedley's constitutional rights.  Initially, there is no evidence in the record indicating that Smedley made any custodial statements to law enforcement, except for when Detective Phillips questioned Smedley after execution of the State Warrant.  (Doc. No. 38 at PageID 291.)  Undoubtably, "statements made during a defendant's 'custodial interrogation' must be suppressed unless authorities advise[d] the defendant of his or her rights."  *U.S. v. Diaz*, 179 Fed. App'x. 938, 943-44 (6th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 476 (1966)).

Yet, as a practical matter, the Court cannot suppress statements that were not made. *Id.* at 944 ("Since [defendant] made no statements to the police, his *Miranda* claim is irrelevant"). Accordingly, the Court's analysis in this case focuses solely on Detective Phillips' questioning of Smedley following execution of the State Warrant.

Smedley appears to argue that his statements to Detective Phillips were made pursuant to a waiver of Smedley's constitutional rights that was not knowing or voluntary. (*See* Doc. No. 39 at PageID 338-39.) Smedley's Memo lays out statements of the law to this effect, but does not explain why Smedley's waiver was invalid. (*Id.*) Rather, Smedley makes the conclusory contention that "custodial statements taken from Defendant were obtained in violation of Defendant's constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States." (*Id.* (citations omitted).) However, the Court may more fully glean the substance of Smedley's argument from his questioning of Detective Phillips. At his suppression hearing, Smedley made a point to ask Detective Phillips whether he believed Smedley to be under the influence of drugs and alcohol when he agreed to speak with police. (Doc. No. 38 at PageID 304.) Thus, the Court assumes Smedley's argument to be that he was so impaired by drug and alcohol abuse that he could not have knowingly and voluntarily waived his rights by speaking with Detective Phillips.

Fundamentally, the Constitution affords criminal defendants a right against self-incrimination and a right to have the assistance of counsel for defense against prosecution. U.S. CONST. AMEND. V (right against self-incrimination); U.S. CONST. AMEND. VI (right to assistance of counsel). In the seminal case, *Miranda*, the Supreme Court established a prophylactic rule for protecting these constitutional rights. That rule requires law enforcement officers to advise suspects-in-custody of their rights under the Fifth and Sixth amendments before subjecting the

21

suspect to interrogation.  *Miranda*, 384 U.S. at 467-71.  After receiving his *Miranda* warnings, a suspect may choose to waive his constitutional rights and speak with the interrogating officer(s). *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  However, to be valid, the suspect's waiver must be made knowingly and voluntarily.  *Id.*  Whether a defendant's waiver of his *Miranda* rights was knowing and voluntary will be drawn from "the particular facts and circumstances surrounding [the] case."  *Id.* at 374 (internal citations and quotation marks omitted).  Furthermore, when reviewing a defendant's waiver of his constitutional rights, courts are to "indulge in every reasonable presumption against waiver."  *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

Here, the Court finds that Smedley did knowingly and voluntarily waive his Fifth and Sixth Amendment rights when he spoke with Detective Phillips following execution of the State Warrant.  Smedley was unquestionably in police custody after execution of the State Warrant. Detective Phillips testified that he "*Mirandized*" Smedley prior to questioning him regarding "the suspected evidence [Detective Phillips] just located inside [Smedley's] residence."  (Doc. No. 38 at PageID 291.)  Smedley appeared to understand these rights and agreed to speak with law enforcement.  (*Id.*)  The Court need not consider whether drug and alcohol abuse otherwise impaired Smedley's ability to knowingly and voluntarily waive his *Miranda* rights.  Bluntly, there is no evidence here to that effect.  Indeed, Detective Phillips testified that he has been around impaired individuals many times and Smedley did not appear to be intoxicated.  (*Id.* at PageID 304.)  Instead, Smedley appeared to understand his rights as they were read to him and he chose to speak with Detective Phillips anyway.  (*Id.* at PageID 291.)

The Court cannot reasonably consider Smedley's actions to constitute anything but a knowing and voluntary waiver of his constitutional rights.  Therefore, the Court **DENIES** the instant Motion with respect to Smedley's custodial statements.

**III.**    <u>**CONCLUSION**</u>

In accordance with the foregoing analyses, the Court hereby **DENIES** Smedley's Motion to Suppress and Request for Hearing (Doc. No. 28) in all respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, June 18, 2024.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE